```
                                              ┌─────────────────────────────┐
                                              │ USDC SDNY                   │
                                              │ DOCUMENT                    │
UNITED STATES DISTRICT COURT                  │ ELECTRONICALLY FILED        │
SOUTHERN DISTRICT OF NEW YORK                 │ DOC #: _____  │
                                              │ DATE FILED: 6/29/16         │
                                              └─────────────────────────────┘
```

UNITED STATES OF AMERICA,

        -against-

JAMES MCDOW,

        Defendant.

**MEMORANDUM**
**OPINION & ORDER**

S2 15 Cr. 233 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

      Defendant James McDow is charged with conspiracy to distribute and possess with intent to distribute heroin and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. (S2 Indictment (Dkt. No. 128)) McDow has moved to suppress certain evidence obtained during an encounter with New York City Police Department ("NYPD") officers on August 4, 2014, at 2559 Decatur Avenue, Bronx, New York. (Dkt. No. 76) The evidence at issue includes 153 glassines of heroin; eight Ziplock bags of crack cocaine; $2300 in cash; two cellular phones; and statements McDow made to the police at that time. (Paul Affirm. (Dkt. No. 77)) McDow has also moved for disclosure of Rule 404(b) evidence, as well as Brady and Giglio material. Finally, McDow has moved for an order permitting him to (1) make further motions as he deems necessary; and (2) join in any motions made by co-defendants. (Dkt. Nos. 76, 77)

      For the reasons stated below, McDow's motion to suppress will be granted, and McDow's remaining motions will be denied.

## BACKGROUND

### I.   MCDOW'S AFFIDAVIT

In an affidavit submitted in support of his motion to suppress, McDow asserts the

following:

> . . . On August 4, 2014, I was arrested by the New York City police and charged with Criminal Possession of a Controlled Substance in the Third Degree, Criminal Possession of a Controlled Substance in the Fourth Degree, and Criminal Possession of a Controlled Substance in the Seventh Degree.

> . . . While standing on the sidewalk in front of 2559 Decatur Avenue, County of Bronx, I was stopped and questioned at approximately 6:18 P.M. when two police officers in uniform drove up in an unmarked car and after they got out of the car and approached me they told me to move away from that location. When I proceeded to do so[,] they called me back, asked if I had any weapons on my possession and, after I told them I did not, they proceeded to search inside all of my pockets.

> . . . The police officers then asked if I had a key to the building I was standing in front of, specifically 2559 Decatur Avenue, and when I answered that I did[,] they requested that I open the front door. After I did as directed I was again searched thoroughly inside the building and then asked if I lived inside the building. I told them that I did not but [that] my God mother lived on the fourth floor. We then walked upstairs where I opened the apartment door to my God mother's apartment. After doing so we returned downstairs.

> . . . When we arrived downstairs I was again searched through this time, after the police looked inside my pockets, I was strip searched by them.

> . . . Thereafter I was placed under arrest. When I asked why I was being arrested I was told it was for trespassing inside of 2563 Decatur Avenue. I was then taken to the police car, and then to the precinct where I was processed and thereafter brought to the Criminal Court.

> . . . At no time prior to being taken into custody, was I given my Miranda rights.

(McDow Aff. (Dkt. No. 78)) ¶¶ 4-9)

## II.    EVIDENCE AT SUPPRESSION HEARING

On April 14, 2016, and April 18, 2016, the Court conducted an evidentiary

hearing concerning McDow's suppression motion. (Suppression Hearing Tr. (Dkt. Nos. 132,

141) ("Hearing Tr.")) The Government called NYPD officers Brandon Gembecki and Sean

Kinane, both of whom are assigned to the 52nd Precinct in the Bronx. (Hearing Tr. (Dkt. No.

132) at 2-3, 51)[1] McDow did not testify at the hearing.

### A.    The Video Evidence

During the suppression hearing, the Government introduced a video that shows

the August 4, 2014 encounter between McDow and Officers Gembecki and Kinane outside 2559

Decatur Avenue (the "Building").[2] (Government Exhibit ("GX") 2) The video contains three

segments. The first segment shows the initial encounter between McDow and the two police

officers on the sidewalk outside 2559 Decatur Avenue, and their subsequent entry into the

Building. The second segment shows the scene outside 2559 Decatur while McDow and the

police officers are inside the Building. The third segment shows the two police officers and

McDow exit the Building and walk to the officers' vehicle. See id.

The first video segment begins with McDow standing on the street in front of

2559 Decatur Avenue with several other African-American men. No criminal activity is

apparent. (GX 2, Video Segment 1 at 0:00-0:25) Officer Gembecki and Kinane's police vehicle

---

[1] The page numbers of documents referenced in this opinion correspond to the page numbers
designated by this District's Electronic Case Filing system.

[2] The parties agree that the video introduced by the Government was obtained from McDow's
cell phone. (See Hearing Tr. (Dkt. No. 141) at 8-9) The defense states – and the Government
does not dispute – that after his August 4, 2014 arrest, McDow returned to 2559 Decatur Avenue
and obtained access to video footage from a security camera outside the Building. McDow
recorded this video footage on his cell phone, and excerpts were played at the hearing. (See id.;
see also Hearing Tr. (Dkt. No. 132) at 49-50)

3

pulls up and stops in front of the Building, and the two officers are shown exiting the vehicle. (Id. at 0:09-0:30)  Officer Gembecki speaks to the group – including McDow – and the men then walk away.  (Id. at 0:34-45)  Gembecki appears to direct McDow to return, however.  (Id. at 0:53-56)

Officer Gembecki and McDow then engage in a conversation in front of the Building.  (Id. at 0:58)  While Officer Gembecki is speaking with McDow, Officer Kinane takes a position directly in back of McDow.  Officer Kinane remains in this position throughout the conversation between Officer Gembecki and McDow.  (Id. at 1:00-07)  The video shows Officer Gembecki searching the right front pocket of McDow's pants.  (Id. at 1:09-32)  Officer Gembecki also appears to be directing McDow to empty his right front pocket, and McDow appears to reach into that pocket.  (Id. at 1:15-20)  The video then shows Officer Gembecki searching McDow's left front pocket and left rear pocket.  (Id. at 1:32-36, 1:34-47, 1:57-2:09) As Officer Gembecki searches McDow's rear left pocket, McDow looks over his shoulder, where Officer Kinane is standing close behind him.  (Id. at 2:06-09).

McDow then takes a key out of his pocket and uses it to open the front door of the Building.  (Id. at 2:50-59)  This segment ends after McDow enters the Building, followed by the two police officers.  (Id. at 3:00-09)

The second video segment – which is 21 seconds long – shows the sidewalk outside the Building during the time that McDow and the two police officers are inside the Building.  (GX 2, Video Segment 2)

The third video segment shows McDow walking out of the Building with the two police officers.  (GX 2, Video Segment 3 at 1:15)  McDow – who is handcuffed – follows Officer Gembecki to the officers' vehicle; Officer Kinane follows McDow.  (Id. at 1:15-26)

4

### B.      The Police Officers' Testimony

In August 2014, Officers Gembecki and Kinane were assigned to a "conditions team" at the 52nd Precinct. (Hearing Tr. (Dkt. No. 132) at 3, 51) A "conditions team" "address[es] conditions that are occurring in [the] precinct," including "narcotics, prostitution, [and] quality of life [offenses]." (Id. at 3, 51) On August 4, 2014, the day of McDow's arrest, Officers Gembecki and Kinane were focused on narcotics activity. (Id. at 5, 53-54) Each officer has made hundreds of narcotics arrests in the course of his career. (Id. at 3, 52)

Officers Gembecki and Kinane were working the 3:00 p.m. to 11:35 p.m. shift on August 4, 2014 (id. at 4), and that afternoon they proceeded to Decatur Avenue between East 193rd Street and Fordham Road. (Id. at 5, 52) The officers selected that block because "[i]t was a known narcotics-prone location." (Id.) Both officers had conducted patrols on that block and had observed crack pipes, needles, and other drug paraphernalia in the lobbies and stairways of buildings in the area. (Id. at 4, 26-27, 52-53) Officer Gembecki had dealt with an apparent drug overdose in that area (id. at 4), and Officer Kinane had made arrests and done car stops in that area, during which he had recovered narcotics. (Id. at 52, 71)

Officers Gembecki and Kinane – who were in uniform – arrived at Decatur Avenue at approximately 5:45 p.m. in an unmarked police vehicle. (Id. at 5, 8, 26, 53-54, 58) It was daylight when the officers arrived. (Id. at 7, 55) The officers went to a rooftop on the southeast corner of East 193rd Street and Decatur Avenue. (Id. at 5, 54) At that location, they were approximately five stories above street-level. (Id. at 24-25) From the rooftop, the officers were able to observe "the entire block [of Decatur Avenue] from Fordham [Road] to 193rd Street." (Id. at 54) While the officers were on the rooftop, Officer Kinane used binoculars to

observe the street. (Id. at 7, 55) Officer Kinane reported his observations to Officer Gembecki,

who was "securing the roof" and who was not observing the street. (Id. at 7, 22-23, 55)

From the rooftop, Officer Kinane noticed a "large individual" who was "possibly"

wearing a "white [tee]-shirt." (Id. at 55, 75) Officer Gembecki stated that Officer Kinane

described a "male black, heavyset, wearing a white . . . long-sleeve shirt." (Id. at 7) Officer

Kinane watched this individual – Defendant McDow – for approximately "forty-five minutes,

[or] an hour maybe."[3] (Id. at 57)

Officer Kinane testified that he

> observed the defendant . . . between . . . East Fordham [Road] and 193[rd Street]
> on Decatur [Avenue] standing on the street. [He] observed what [he] believed to
> have been a buyer, somebody coming to purchase narcotics, walk down the street
> and approach a possible lookout or a . . . steer[er][,] somebody who would say,
> this is where you go to purchase narcotics. As [he was] observing . . . this
> individual then . . . approached McDow. And [he] observed a quick exchange or
> a quick meeting. And then the individuals would leave the location shortly after.

(Id. at 56)[4]

When asked what he meant by an "exchange," Officer Kinane explained that he

"meant . . . two people meeting . . . each other, and then one of them leaving the location, the

other one staying." Officer Kinane believed that such an encounter was "a narcotics

transaction." (Id.) Officer Kinane could not "remember exactly how many" such "quick

meetings" he observed McDow engage in, but he "believe[s] it was more than one." (Id. at 57,

73) Officer Gembecki testified that Officer Kinane described "individuals [who] met with

---

[3] Officer Gembecki testified that Officer Kinane conducted his rooftop observations for
"approximately [a] half-hour, [or] forty-five minutes." (Id. at 8)

[4] Officer Kinane explained that lookouts and steerers are part of "a narcotics set. . . . You have
one person saying . . . this is where you can go get what you need." (Id.)

[McDow] for a short, brief time, and left shortly thereafter." (Id. at 8)  According to Officer Gembecki, Officer Kinane described "approximately two" such meetings.  (Id.)

Officer Kinane testified that he could not recall whether McDow was standing on the street alone or with other individuals during the 45 to 60 minutes Kinane observed him (id. at 75), nor could Officer Kinane recall whether "the defendant [went] to any location with any other individual." (Id. at 57)

After Officer Kinane made these observations, the two officers retrieved their police vehicle and drove to Decatur Avenue between East Fordham Road and 193rd Street. (Id. at 8, 26, 53, 58)  After arriving at that location,[5] the two officers approached McDow, who was standing on the sidewalk with several other individuals.  (Id. at 32)

Officer Gembecki denied that he told McDow and the men with him to walk away. (Id. at 32-33)  Instead, according to Officer Gembecki, McDow started to walk away as the officers approached, and Officer Gembecki said to McDow "something along the lines of, sir, we need to talk to you," causing McDow to return.  (Id. at 34-35)  Officer Gembecki "vaguely remember[s] asking" McDow "something along the lines of . . . if he had anything on him that he shouldn't have." (Id. at 13, 35)  McDow appeared "very nervous" and "ask[ed] [the officers] to go inside to get off the sidewalk."  (Id. at 13)  Officer Gembecki "frisk[ed] the defendant on the sidewalk" but recovered nothing.[6]  (Id. at 13, 43, 59, 90)

---

[5] Officer Gembecki testified on direct examination that the officers approached McDow in front of 2563 Decatur Avenue. (Id. at 20-21)  The report prepared by Officer Kinane at the time of the arrest also states that the officers' encounter with McDow took place at 2563 Decatur Avenue. (Id. at 75-76)  On cross-examination, however, both officers admitted that they had been mistaken about the address, and that their encounter with McDow took place outside 2559 Decatur Avenue.  (Id. at 28-29, 75-76, 80)

[6] Officer Gembecki was shown the first segment on the video (GX 2) and asked whether he saw himself reaching inside McDow's pocket.  Gembecki testified that he could not determine from the video whether he was looking inside McDow's pockets or had "[his] hand in [McDow's]

7

Officers Gembecki and Kinane acknowledge that – from the outset of their

encounter with McDow – Officer Kinane stood immediately behind McDow. (Id. at 35-36, 83)

Officer Kinane also admitted that his purpose in standing directly behind McDow was "securing

that location so that [McDow] could not leave." (Id. at 83) Indeed, both officers testified that –

from the moment they first approached McDow on the sidewalk – he was not "free to go." (Id.

at 36-37, 77)

Both officers recalled entering the Building after the initial encounter with

McDow on the sidewalk. (Id. at 13, 59) Officer Gembecki testified that "[McDow] ask[ed] [the

officers] to go inside to get off the sidewalk," and that he "was very adamant about going inside

the building." (Id. at 13, 37) According to Officer Gembecki, he and Officer Kinane agreed to

McDow's request because "[they] didn't want a confrontation on the street. There [were] other

individuals on the street that he was with. [The officers] wanted to put [McDow] at ease." (Id.

at 14) Officer Kinane testified, however, that he "[did not] remember whether it was . . . Mr.

McDow's request or [the officers'] request to enter the building." (Id. at 83)

Once inside the lobby, Officer Gembecki "asked [McDow] again if he had

anything on [him that] he shouldn't have." (Id. at 15) McDow responded that "he had a couple

of Bs and a couple of crills on him"; the officers understood "Bs" to refer to "bundles of heroin"[7]

and "crills" to refer to crack cocaine. (Id. at 15, 58-59) Both officers testified that while they

were in the lobby of the Building they recovered one bundle of heroin from McDow. (Id. at 39,

43, 59) Officer Gembecki testified that the heroin was located in McDow's waistband, and that

he "[did not] recall if [he] asked [McDow] to recover [the bundle of heroin] and give it to

pocket." (Id. at 36-37) Officer Kinane testified, however, that the video shows Officer
Gembecki looking inside McDow's pockets. (Id. at 83)

[7] "A bundle [of heroin] is . . . ten" glassine envelopes of heroin. (Id. at 19)

[Officer Gembecki] or if [Officer Gembecki] recovered it or if [Officer Gembecki] asked [McDow] where it was and [then] recovered it." (Id. at 45)  Officer Kinane testified that the officers recovered a bundle of heroin as the result of "a frisk . . . [that] occurred" in the Building lobby, but he did not recall who conducted the frisk of McDow. (Id. at 84, 93)  Officer Kinane further testified that – because the officers were about to "put [McDow] in handcuffs and put him in the patrol car" – they would have conducted a "full search" of McDow in the lobby. (Id. at 84, 93)

The two officers handcuffed McDow in the lobby and led him outside to their police vehicle.[8] (Id. at 17-18, 60)  Officer Gembecki entered the driver's seat while Officer Kinane sat in the back seat with McDow. (Id. at 17, 60)  On the way to the 52nd Precinct, Officer Kinane and McDow spoke "about [a] possible desk appearance ticket ["DAT"], which means [McDow] would have been released that day for . . . the one bundle that he had." (Id. at 60; see also id. at 46-47)  In response to Officer Kinane's remarks about a desk appearance ticket, Officer Kinane recalls that McDow "stated that he was on parole and that he wouldn't be eligible for a DAT." (Id. at 61)  Officer Gembecki testified, however, that McDow stated that he would not be eligible for a DAT "because [he] [had] more drugs on [him], or something like that." (Id. at 46)  According to Officer Kinane, McDow – although handcuffed – then "started to lean forward and inch additional narcotics out of his waistband," which Officer Kinane took custody of. (Id. at 61-62)  The additional bundles of heroin Officer Kinane recovered at that time were about five to six inches long and three or four inches deep. (Id. at 95, 101)

---

[8]  Both officers deny that they took McDow to any location in the Building other than the lobby. (Id. at 17, 59)  According to the officers, McDow asked to go to an apartment in the Building to drop off cash he was carrying (id. at 19-20, 58-59), but that request was denied. (Id. at 19-20, 59)

Both officers testified that McDow was not given <u>Miranda</u> warnings prior to arriving at the 52nd Precinct. (<u>Id.</u> at 16, 91)

At the precinct, police recovered two cell phones and $2300 in cash from McDow.[9] (<u>Id.</u> at 66, 92)

## C.    **Officer Kinane's Grand Jury Testimony**

At the suppression hearing, Officer Kinane was cross-examined about certain testimony he had given to a state grand jury concerning his August 4, 2014 encounter with McDow. Officer Kinane testified before the state grand jury on November 13, 2014 (Kinane 3502-08), about three months after McDow's arrest. It became clear during the suppression hearing that Officer Kinane's state grand jury testimony differed in important respects from his testimony at the hearing.

For example, Officer Kinane testified in the state grand jury that as he approached McDow on Decatur Avenue he observed McDow "exchanging U.S. currency for objects." (<u>Id.</u> at 67; <u>see</u> Kinane 3502-08 (State Grand Jury Tr.) at JG 4 ("[a]fter my observation [from the rooftop] and upon my way to the street, we observed him on the street exchanging U.S. currency for objects")) At the suppression hearing, Officer Kinane testified that his grand jury testimony on this point was not accurate, and that "[he] misspoke when [he] was in the grand jury." (Hearing Tr. (Dkt. No. 132) at 67-68, 74)

Officer Kinane was not aware of the existence of the video footage from the security camera at the time he testified in the grand jury. Indeed, Officer Kinane did not review the video evidence (GX 2) until shortly before he testified at the suppression hearing. (Hearing

---

[9] For reasons that are not clear from the record, the $2300 was later returned to McDow. (Hearing Tr. (Dkt. No. 141) at 40-41)

Tr. (Dkt. No. 132) at 76-77)  The video footage obtained from the security camera does not, of course, show McDow engaged in hand-to-hand transactions, and Officer Kinane conceded at the suppression hearing that he had not seen McDow engage in hand-to-hand exchanges as the officers approached him on the street. (Id. at 74-75)

Officer Kinane – who was the arresting officer – also conceded at the suppression hearing that he never told the Assistant District Attorney preparing the charges against McDow, or the state grand jury, that he and Officer Gembecki entered the Building with McDow, or that a bundle of heroin was recovered from McDow in the Building lobby. (Id. at 67, 69-70)

Before the state grand jury, Officer Kinane testified that he had observed McDow from the rooftop for approximately thirty minutes. See Kinane 3502-08 (State Grand Jury Tr.) at JG 4; Hearing Tr. (Dkt. No. 132) at 73-74).  At the suppression hearing, however, Officer Kinane testified that he had observed McDow for approximately forty-five minutes to an hour from the rooftop. (Hearing Tr. (Dkt. No. 132) at 73-74)

## DISCUSSION

## I.    MOTION TO SUPPRESS

McDow contends that all physical evidence recovered from him on August 4, 2014 must be suppressed, because he was subject to an illegal seizure at the time of the search that yielded a bundle of heroin. (Paul Affirm. (Dkt. No. 77) ¶¶ 4, 7-9; Hearing Tr. (Dkt. No. 141) at 12)  McDow further contends that the statements he made to the police officers must likewise be suppressed, because he was in custody when he made these statements, and had not been given Miranda warnings. (Id. at ¶¶ 10-15; Hearing Tr. (Dkt. No. 141) at 7)

The Government contends that McDow's motion to suppress physical evidence should be denied, because Officer Kinane's rooftop observations provided the officers with

11

probable cause to believe that McDow possessed narcotic drugs with intent to sell, in violation of

New York Penal Law § 220.16. (Govt. Br. (Dkt. No. 82) at 4-6; Hearing Tr. (Dkt. No. 132) at

15) As to McDow's statement concerning "Bs" and "crills," the Government argues that

McDow was not in custody when first questioned by the officers, and that <u>Miranda</u> warnings

were therefore not required. (Govt. Br. (Dkt. No. 82) at 7; Hearing Tr. (Dkt. No. 141) at 19-21)

## A.      Whether the Officers Had Probable Cause to Arrest
McDow Based on Officer Kinane's Rooftop Observations

### 1.      Applicable Law

The Fourth Amendment protects "[t]he right of the people to be secure in their

persons . . . against unreasonable searches and seizures." U.S. Const., amend. IV. "A

warrantless arrest is unreasonable under the Fourth Amendment unless the arresting officer has

probable cause to believe a crime has been or is being committed." United States v. Delossantos,

536 F.3d 155, 158 (2d Cir. 2008) (citing Devenpeck v. Alford, 543 U.S. 146, 152 (2004); United

States v. Watson, 423 U.S. 411, 417 (1976)). "'Probable cause to arrest a person exists if the law

enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge

or reasonably trustworthy information to justify a person of reasonable caution in believing that

an offense has been or is being committed by the person to be arrested.'" United States v.

Valentine, 539 F.3d 88, 93 (2d Cir. 2008) (quoting United States v. Patrick, 899 F.2d 169, 171

(2d Cir. 1990)). "The quantum of evidence required to establish probable cause to arrest need

not reach the level of evidence necessary to support a conviction, but it must constitute more

than rumor, suspicion, or even a 'strong reason to suspect.'" United States v. Fisher, 702 F.2d

372, 375 (2d Cir. 1983) (quoting Henry v. United States, 361 U.S. 98, 101 (1959)) (internal

citations omitted). "When making a probable cause determination, '[t]he experience of a [law

enforcement] officer is a factor to be considered.'" Arias v. United States, Nos. 09 Civ.

12

4536(CM), 07 Cr. 813(CM), 2011 WL 1332190, at *3 (S.D.N.Y. Mar. 31, 2011) (quoting Fisher,

702 F.2d at 378) (alterations in original).

"Once probable cause to arrest exists, officers may search the defendant's person

incident to the arrest." United States v. Acosta, No. S1 12 CR 224 (PGG), 2013 WL 1890337, at

*7 (S.D.N.Y. May 6, 2013) (citing Arizona v. Gant, 556 U.S. 332, 338 (2009) (noting that

officers may, without a warrant, conduct "a search incident to a lawful arrest")). "[A] search

incident to arrest . . . requires no additional justification" beyond the probable cause justifying

the arrest; "[i]t is the fact of the lawful arrest which establishes the authority to search." United

States v. Robinson, 414 U.S. 218, 235 (1973). Moreover, so long as there is probable cause at

the time that a search is conducted, a search incident to arrest can take place before the formal

arrest is made. See United States v. Ricard, 563 F.2d 45, 49 (2d Cir. 1977) ("'The mere fact that

[an officer] reversed the procedure, conducting the search before the arrest, did not render it

illegal as long as probable cause to arrest existed at the time of the search. . . . Any other holding

would, without rational basis, exalt form over substance.'" (quoting United States v. Jenkins, 496

F.2d 57, 73 (2d Cir. 1974))); Tarhaqa Allen v. N.Y.C. Police Dep't, No. 07 Civ. 8682 RPP, 2010

WL 1790429, at *9 (S.D.N.Y. May 5, 2010) ("Whether [the defendant] was formally under

arrest at the time that the searches took place is not consequential because a search may take

place before a formal arrest.").

### 2.    Analysis

The Government argues that the police officers had probable cause to arrest

McDow for a drug trafficking offense based on Officer Kinane's rooftop observations. The

evidence proffered by the Government on this point falls far short of probable cause, however.

Officer Kinane testified that he observed McDow from the rooftop for forty-five minutes to an hour. (Hearing Tr. (Dkt. No 132) at 55) During that time, Officer Kinane observed McDow meet quickly with another person: "two people meeting . . . each other, and then one of them leaving the location, the other one staying." (Id. at 56) Officer Kinane could not "remember exactly how many" such interactions he observed during the forty-five minutes to an hour he was watching McDow. He "believe[s] it was more than one." (Id. at 57, 74) Officer Gembecki – who did not make any observations from the rooftop – stated that Officer Kinane described "approximately two" such interactions while they were on the rooftop. (Id. at 8) Officer Kinane also testified that he "observed what [he] believed to have been . . . somebody coming to purchase narcotics, walk down the street and approach a possible lookout or a . . . steer[er][,] somebody who would say, this is where you go to purchase narcotics." (Id. at 56) This testimony is not sufficient to demonstrate that Officers Kinane and Gembecki had probable cause to believe that McDow was engaged in selling drugs.

Even if such vague testimony could provide a basis for probable cause, Officer Kinane's account of what he saw on August 4, 2014 is not reliable. Three months after the August 4, 2014 arrest, Officer Kinane told a state grand jury that when he approached McDow on Decatur Avenue he saw him "exchanging U.S. currency for objects." (Kinane 3502-08 (State Grand Jury Tr.) at JG 4) Kinane conceded at the suppression hearing that this testimony was not accurate. (Hearing Tr. (Dkt. No. 132) at 67-68, 74-75) That Officer Kinane could have given inaccurate testimony about such a critical matter three months after McDow's arrest raises serious questions about whether his testimony nearly two years after the August 4, 2014 arrest can be relied on. Moreover, there are other significant inconsistencies between Officer Kinane's grand jury testimony and his testimony at the suppression hearing.

14

In the grand jury, Officer Kinane testified that – from the rooftop – he observed McDow for thirty minutes and saw him "exchanging U.S. cash with small objects" with three separate individuals. (Kinane 3502-08 (State Grand Jury Tr.) at JG 4)  At the suppression hearing, however, Officer Kinane did not testify as to any of these observations. He made no mention of having observed exchanges of U.S. currency for "small objects"; he did not assert that he had seen McDow meet and conduct exchanges with three separate individuals; and the time period within which Officer Kinane observed McDow grew from the thirty minutes he recalled in the grand jury (id.) to "forty-five minutes [to] an hour." (Hearing Tr. (Dkt. No. 132) at 57)  Officer Kinane's different accounts of what he observed on August 4, 2014, significantly undermine the reliability of his testimony.[10]

Officer Kinane's conclusory testimony about seeing a possible narcotics purchaser "approach a possible lookout or . . . steer[er]" does not assist the Government. Officer Kinane provided no factual details about this alleged encounter, nor did he explain why the conduct of the alleged purchaser and "possible lookout or . . . . steer[er]" led him to believe that a narcotics transaction was taking place. In sum, Officer Kinane's testimony about what he believed to be a "narcotics set" is too vague and conclusory to serve as a basis for probable cause.[11]

---

[10] The Government offered no explanation for these discrepancies.

[11] Where courts in this district have found probable cause based on rooftop observations, police officers have testified that the defendant was seen exchanging U.S. currency for objects. See, e.g., United States v. Vasquez, 297 F. Supp. 2d 696, 697 (S.D.N.Y. 2004) (finding probable cause where, "from a rooftop[,] . . . [an] officer saw [the defendant] reach into a recess in the passenger-side dashboard, remove an object, and give that object to another person in exchange for cash"); Roberts v. Batista, No. 01CIV5264LMMAJP, 2003 WL 1900866, at *1 (S.D.N.Y. Apr. 16, 2003) (finding probable cause where an officer observing from a rooftop "saw a woman approach [a co-defendant], speak briefly with him, and hand money to him" in exchange for "an object," and then saw the defendant engage in multiple "virtually identical transactions"); see also United States v. Washington, No. 02 CR. 1574 (LTS), 2003 WL 21250681, at *2 (S.D.N.Y.

15

In arguing that Officer Kinane's rooftop observations provided probable cause to believe that McDow was engaged in drug trafficking, the Government relies on Morales v. Greiner, 381 F.3d 47 (2d Cir. 2004). While the Government contends that Morales has a "fact pattern . . . similar to the fact pattern here" (see Hearing Tr. (Dkt. No. 141) at 18), the facts in Morales are not comparable to the evidence here.

In Morales, a police officer observed that "[o]n four separate occasions, [the defendant] 'touched hands' with another individual, entered the vestibule of a building with that person, engaged in some sort of transaction, and then quickly exited." Morales, 381 F.3d at 47. The "officer also observed one of the individuals [with whom the defendant had touched hands] holding a glassine envelope in his hands as he emerged from the vestibule – the type of envelope that the undercover officer knew to be used to package narcotics." Id. at 47-48. Moreover, the officer who made these observations was not located on a rooftop at some distance, but was "stationed directly across the street . . . in an unmarked car. . . ," Morales v. Greiner, 273 F. Supp. 2d 236, 239 (E.D.N.Y. 2003). Finally, there is no suggestion in Morales that the officer who testified at the suppression hearing in that case had given a completely different account at an earlier proceeding. In short, Morales provides no support for the Government's position.

The Government also cites text messages stored in McDow's cell phones at the time of his arrest. (GX 5; Hearing Tr. (Dkt. No. 132) at 104-10) Although the Government argues that these text messages provide "independent corroboration . . . about what Officer Kinane testified he observed from the roof" (Hearing Tr. (Dkt. No. 141) at 17), the text messages

---

May 29, 2003) ("In matters involving narcotics sales, the exchange of currency is a factor in supporting probable cause." (citing People v. Schlaich, 218 A.D.2d 398 (1st Dept. 1996); People v. Jones, 219 A.D.2d 417 (1st Dept. 1996))). Here – at the suppression hearing – Officer Kinane did not testify to observing an exchange, much less an exchange that involved an exchange of cash for an object.

16

cannot provide a basis for this Court to find that Officers Gembecki and Kinane had probable cause to arrest McDow, because the officers were not aware of the text messages when they arrested McDow.  In determining whether probable cause existed, this Court must consider the information available to law enforcement officers at the time of arrest.  See Devenpeck, 543 U.S. at 152 ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." (citing Maryland v. Pringle, 540 U.S. 366, 371 (2003))); Shamir v. City of New York, 804 F.3d 553, 557 (2d Cir. 2015) ("Probable cause is determined on the basis of facts 'known to the arresting officer at the time of the arrest'" (quoting Devenpeck, 543 U.S. at 152 and citing Lowth v. Town of Cheektowaga, 82 F.3d 563, 569 (2d Cir. 1996))); Fabrikant v. French, 691 F.3d 193, 217 (2d Cir. 2012) ("'[P]robable cause encompasses only that information available to the arresting officer prior to and including the point of seizure.'" (quoting Warren v. Dwyer, 906 F.2d 70, 73 (2d Cir. 1990))); Ackerson v. City of White Plains, 702 F.3d 15, 19-20 (2d Cir. 2012), as amended (Dec. 4, 2012) ("In deciding whether probable cause existed for an arrest, we assess 'whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest.'" (quoting Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006))).

For all these reasons, the Court concludes that Officers Gembecki and Kinane did not have probable cause to arrest McDow based on Officer Kinane's rooftop observations.

## B. Whether McDow's Statement in the Building Lobby Must be Suppressed under Miranda

The Government argues that when McDow told Officers Gembecki and Kinane that "he had a couple of Bs and a couple of crills on him" (Hearing Tr. (Dkt. No. 132) at 15), "he was not yet in custody." (Govt. Br. (Dkt. No. 82) at 7) Therefore, Miranda warnings were not

required. (Govt. Br. (Dkt. No. 82) at 7)  McDow argues, however, that he was in custody for

purposes of Miranda at the time he made this statement. (Hearing Tr. (Dkt. No. 141) at 13)

   As discussed below, the Court concludes that McDow was in custody for

purposes of Miranda when he told the officers that he possessed "Bs" and "crills."

## 1.   Applicable Law

   For purposes of Miranda, "'[a]n accused is in custody when, even in the absence

of an actual arrest, law enforcement officials act or speak in a manner that conveys the message

that they would not permit the accused to leave.'" Tankleff v. Senkowski, 135 F.3d 235, 244 (2d

Cir. 1998) (quoting United States v. Kirsh, 54 F.3d 1062, 1067 (2d Cir. 1995)).

   The Second Circuit uses a two-step objective test to determine whether a suspect

is in custody:

> The first step requires consideration of whether a reasonable person in the
> defendant's position would have understood that he or she was free to leave.
> United States v. Newton, 369 F.3d 659, 670 (2d Cir. 2004).  Among the factors
> relevant to this determination are whether the suspect is told that he is free to
> leave, the location and atmosphere of the interrogation, the language and tone
> used by the law enforcement officers, whether the suspect is searched or frisked,
> and the length of the interrogation.  Tankleff, 135 F.3d at 244; see also Berkemer
> v. McCarty, 468 U.S. 420, 437-38 (1984); Oregon v. Mathiason, 429 U.S. 492,
> 494–95 (1977); Campaneria v. Reid, 891 F.2d 1014, 1021 n.1 (2d Cir.1989);
> United States v. Guarno, 819 F.2d 28, 31-32 (2d Cir. 1987).  The second step, and
> the "ultimate inquiry," Newton, 369 F.3d at 670, looks to whether there was a
> restraint of freedom of movement akin to that associated with a formal arrest, id.

United States v. Guzman, 724 F. Supp. 2d 434, 445 (S.D.N.Y. 2010).

   "[A] suspect is[, of course,] entitled to Miranda warnings . . . if he . . . is

interrogated while 'in custody.'" Tankleff, 135 F.3d at 242-43 (citing Thompson v. Keohane,

516 U.S. 99, 100-01 (1995)); see Newton, 369 F.3d at 669 ("Miranda's warning requirements

apply . . . to 'custodial interrogation.'" (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966))).

Moreover, "Miranda instructs generally that an uncounseled statement made by a defendant

during custodial interrogation should be suppressed. . . ." United States v. Gaines, 295 F.3d 293,

297 (2d Cir. 2002) (citing Miranda, 384 U.S. at 444); see New York v. Quarles, 467 U.S. 649,

654 (1984) ("[I]nterrogation in certain custodial circumstances is inherently coercive and . . .

statements made under those circumstances are inadmissible. . . ."); United States v. Mathurin,

148 F.3d 68, 69 (2d Cir. 1998) ("'[U]nwarned statements that are otherwise voluntary within the

meaning of the Fifth Amendment must nevertheless be excluded from evidence under

Miranda.'" (quoting Oregon v. Elstad, 470 U.S. 298, 307 (1985))); United States v. Morales, 788

F.2d 883, 885 (2d Cir. 1986) ("It is axiomatic that a statement obtained in violation of Miranda is

ordinarily inadmissible at trial.").

## 2.   Analysis

Here, the evidence demonstrates that – from their initial approach – the officers

asserted control over McDow in multiple, significant ways.

When the officers first approached, McDow and his companions began walking

away. Officer Gembecki directed McDow to return, however. (Hearing Tr. (Dkt. No. 132) at

34-35; GX 2, Video Segment 1 at 0:34-56; McDow Aff. (Dkt. No. 78) ¶ 5 ("[The officers] told

me to move away from that location. When I proceeded to do so[,] they called me back. . . ."))

Officer Gembecki then began interrogating McDow, asking him multiple times

whether he had any contraband on his person. (Id. at 13, 34-36; McDow Aff. (Dkt. No. 78) at

¶ 5) During this questioning, Officer Kinane assumed a position immediately behind McDow,

blocking him from leaving. (Id. at 35-36, 83) It is apparent from the security camera video both

that Officer Kinane blocked McDow from leaving and that McDow was aware of Officer

Kinane's presence behind him. (GX 2, Video Segment 1 at 2:06-09) Moreover, Officer Kinane

testified that his purpose in standing directly behind McDow was to "secur[e] that location so

19

that [McDow] could not leave." (Hearing Tr. (Dkt. No. 132) at 83) Actions taken by police

officers to restrict a suspect's freedom of movement weigh in favor of finding Miranda custody.

See J.D.B. v. N. Carolina, 564 U.S. 261, 297 (2011) ("The Miranda custody rule has always

taken into account . . . restrictions on a suspect's freedom of movement. . . ."); Cruz v. Miller,

255 F.3d 77, 82 (2d Cir. 2001) ("depriving a person of 'freedom of action' is relevant to

triggering Miranda warnings"); United States v. Abbas, 418 F. Supp. 2d 280, 286 (W.D.N.Y.

2006) (finding custody for Miranda purposes where a law enforcement agent "stood and blocked

the door" to prevent the suspect from leaving).

            Officer Gembecki also exercised control over McDow by conducting a thorough

search of his pockets. Although Officer Gembecki testified that he merely "frisk[ed] the

defendant on th[e] sidewalk," "touching his pocket" (id. at 13, 36-37), the video evidence shows

that Officer Gembecki conducted thorough searches of McDow's right and left front pockets,

and left rear pocket. (See GX 2, Video Segment 1 at 1:09-32, 1:34-47, 1:57-2:09) The video

also shows Officer Gembecki looking inside McDow's pockets as he is searching (id. at 1:32-36,

2:01-03), and directing McDow to empty one of his pockets. (Id. at 1:15-20) Officer Kinane

confirmed that the video shows Officer Gembecki searching McDow's pockets. (Hearing Tr.

(Dkt. No. 132) at 83) In sum, the video evidence corroborates McDow's assertion that the police

officers "proceeded to search inside all of [his] pockets" on the sidewalk. (McDow Aff. (Dkt.

No. 78) ¶ 5) A search of a suspect supports a finding of custody for purposes of Miranda. See

Tankleff, 135 F.3d at 244 (factors examined by courts in determining whether a suspect is in

custody include "whether the suspect is searched, frisked, or patted down" (citing United States

v. Wilson, 901 F. Supp. 172, 175 (S.D.N.Y. 1995))).

The search of McDow on the sidewalk yielded no contraband (Hearing Tr. (Dkt. No. 132) at 13, 43, 59, 90), and the police officers and McDow then entered the lobby of 2559 Decatur Avenue. While Officer Gembecki testified that McDow asked to enter the building (id. at 13, 37), and Officer Kinane testified that he could not recall "whether it was on Mr. McDow's request or our request to enter the building" (id. at 83), the Court credits McDow's assertion that the officers "requested that [he] open the front door" to 2559 Decatur Avenue and enter the building. (McDow Aff. (Dkt. No. 78) ¶ 6) Having searched McDow's pockets outside on the sidewalk and discovered no contraband, the Court finds that the officers wished to conduct a more thorough search inside the Building and – as Officer Gembecki testified – to avoid "a confrontation on the street." (Hearing Tr. (Dkt. No. 132) at 14) Given that the search on the sidewalk had yielded nothing, there is no plausible explanation for why McDow would have wanted to bring the officers inside the Building. Accordingly, the officers exercised further control over McDow by instructing him to unlock the front door of 2559 Decatur Avenue and enter the lobby.

Finally, both officers testified that – from the time they first approached McDow on the sidewalk – he was not free to leave. (Id. at 36-37, 77) Acknowledging that "[t]he test for custody is an objective one," which asks "whether a reasonable person would have thought he was free to leave the police encounter at issue," Newton, 369 F.3d at 671-72, "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." Stansbury v. California, 511 U.S. 318, 325 (1994) (citing Michigan v. Chesternut, 486 U.S. 567, 575 & n.7 (1988)); see id. (an officer's subjective beliefs "are relevant . . . to the extent they would affect how a reasonable person in the position of the

21

individual being questioned would gauge the breadth of his . . . 'freedom of action'" (quoting Berkemer, 468 U.S. at 440)).

Here, the officers conveyed through their actions that McDow was not free to leave: Officer Gembecki's questioning clearly communicated that the officers suspected that McDow was carrying contraband. The officers also exercised control over his movements by blocking his ability to walk away, by searching his person, and by instructing him to unlock the front door to a nearby building and walk inside, where the interrogation continued. A reasonable person in McDow's position would not have felt free to leave. Indeed, McDow was subject to a "restraint of freedom of movement akin to that associated with a formal arrest." Guzman, 724 F. Supp. 2d at 445 (citing Newton, 369 F.3d at 670).

For all of these reasons, this Court concludes that McDow was in custody for purposes of Miranda when he entered the lobby of 2559 Decatur Avenue with the officers.

Inside the lobby, Officer Gembecki "asked [McDow] again if he had anything on [him that] he shouldn't have," and McDow responded that "he had a couple of Bs and a couple of crills on him," which the officers understood as referring to heroin and crack cocaine. (Hearing Tr. (Dkt. No. 132) at 15, 58-59) Because McDow was in custody at this time, Officer Gembecki's questioning constitutes custodial interrogation, and McDow's incriminating statement was the product of custodial interrogation. See Jackson v. Conway, 763 F.3d 115, 137 (2d Cir. 2014) ("[i]n the context of Miranda, 'the term "interrogation"'" includes "'express questioning'" (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980))). Miranda warnings had not been administered to McDow, however (see Hearing Tr. (Dkt. No. 132) at 16, 91; McDow Aff. (Dkt. No. 78) ¶ 9), even though "'[t]he warning requirements of Miranda . . . apply in situations of "custodial interrogation."'" Allen v. City of New York, No. 09 CIV. 6229 RMB,

2011 WL 1487077, at \*3 (S.D.N.Y. Mar. 16, 2011) (quoting United States v. Mompremier, No.
09 Cr. 759, 2010 WL 1404219, at \*5 (S.D.N.Y. Apr. 6, 2010)).

"Miranda instructs generally that an uncounseled statement made by a defendant
during custodial interrogation should be suppressed. . . ." Gaines, 295 F.3d at 297 (citing
Miranda, 384 U.S. at 444), and "'unwarned statements that are otherwise voluntary within the
meaning of the Fifth Amendment must nevertheless be excluded from evidence under
Miranda.'" Mathurin, 148 F.3d at 69 (quoting Elstad, 470 U.S. at 307). Accordingly, because
McDow was subjected to custodial interrogation without having received Miranda warnings, the
statement about "Bs" and "crills" he made in the Building lobby in response to that custodial
interrogation must be suppressed. See United States v. Hester, No. 14 CR 420 VB, 2015 WL
861749, at \*2 (S.D.N.Y. Feb. 9, 2015) ("'[s]tatements obtained in violation of Miranda generally
must be suppressed.'" (quoting Irizarry v. Ercole, 2011 WL 9753854, at \*8 (S.D.N.Y. May 26,
2011))). [12]

---

[12] While the Court has concluded that McDow's statement about possessing "Bs" and "crills"
must be suppressed under Miranda, McDow has not argued, and the Court does not find, that
McDow's statement was involuntary or coerced under the Due Process Clause. The standard for
determining whether a statement is involuntary and coerced under the Due Process Clause is, of
course, "analytically distinct" from the standard for determining whether a statement was
obtained in violation of Miranda. Tankleff, 135 F.3d at 242 (quoting Oregon, 470 U.S. at 304).
Statements obtained in violation of Miranda may nonetheless be voluntary and uncoerced for
purposes of the Due Process Clause. Id.; see United States v. O'Brien, 498 F. Supp. 2d 520, 534
(N.D.N.Y. 2007), aff'd, 303 F. App'x 948 (2d Cir. 2008) (for purposes of the Due Process
Clause, "the failure to Mirandize does not alone demonstrate coercion"). Under the Due Process
Clause, a statement "'is not voluntary when obtained under circumstances that overbear the
defendant's will at the time it is given.'" United States v. Williams, 681 F.3d 35, 45 (2d Cir.
2012) (quoting United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991)); see United States v.
Iverson, No. 14-CR-197, 2016 WL 736451, at \*9 (W.D.N.Y. Feb. 25, 2016) ("A statement is not
voluntary if the government obtained the statement by physical or psychological coercion or by
improper inducement so that the suspect's will was overborne." (internal quotation marks and
citation omitted)). By contrast, a statement is voluntary and uncoerced when "[t]he
circumstances of [police] questioning 'contain no traces of the "brutality, [p]sychological duress,
[or] threats . . ." that courts have . . . found when they have concluded that statements were

23

For all of these reasons, McDow's motion to suppress his statement about

possessing "Bs" and "crills" will be granted.[13]

---

involuntarily made.'" United States v. Moore, 670 F.3d 222, 233 (2d Cir. 2012) (quoting United States v. Verdugo, 617 F.3d 565, 575 (1st Cir. 2010))); see Fare v. Michael C., 442 U.S. 707, 726-27 (1979) (statement was voluntary and uncoerced under the Due Process Clause where the police did not use "trickery or deceit" or "intimidate or threaten" the suspect).

Here, there is no evidence that Officers Gembecki and Kinane employed any "'of the "brutality, [p]sychological duress, [or] threats . . ." that courts have . . . found when they have concluded that statements were involuntarily made.'" Moore, 670 F.3d at 233 (quoting Verdugo, 617 F.3d at 575). Accordingly, while McDow's statement about possessing "Bs" and "crills" must be suppressed under Miranda, that statement was nonetheless voluntary and uncoerced under the Due Process Clause.

[13] Although McDow's statement regarding "Bs" and "crills" was obtained in violation of Miranda, and led to the officers' recovery of a bundle of heroin from McDow in the Building lobby, the Supreme Court has determined that physical evidence obtained as the result of a Miranda violation is not subject to suppression because of the Miranda violation. See United States v. Patane, 542 U.S. 630, 634, 641-42 (2004) ("[F]ailure to give a suspect the warnings prescribed by Miranda v. Arizona, 384 U.S. 436 (1966)" does not "require[] suppression of the physical fruits of the suspect's unwarned but voluntary statements. . . . '[T]he exclusion of unwarned statements . . . is a complete and sufficient remedy' for any perceived Miranda violation." (alteration in Patane) (footnote omitted) (quoting Chavez v. Martinez, 538 U.S. 760, 790 (2003))); United States v. McCoy, 407 F. App'x 514, 516 (2d Cir. 2010) (summary order) (appellant's argument that physical evidence obtained as the result of a Miranda violation must be suppressed "is foreclosed . . . by the Supreme Court's decision in United States v. Patane, 542 U.S. 630 (2004). . . . In Patane, the Supreme Court held that failure to give Miranda warnings does not require suppression of physical evidence discovered as a consequence of unwarned statements that are voluntary and uncoerced." (citing Patane, 542 U.S. at 637-44)). Moreover, the Second Circuit has held that statements taken in violation of Miranda can provide a basis for probable cause, thereby justifying a subsequent arrest and search. See Morales, 788 F.2d at 886-87 ("Where . . . there is no indication of trickery or coercion[,] . . . [s]uppression of the uncounseled statements at the trial is sufficient to further the purposes of Miranda," and "unwarned statement[s] [are] a proper basis for probable cause to arrest. . . . [Physical] evidence seized after the arrest should not . . . be[] suppressed.").

Accordingly, in order to determine whether the physical evidence recovered from McDow in the Building lobby should be suppressed, this Court must consider whether McDow – at the time of the encounter in the Building lobby – had been illegally detained under the Fourth Amendment. That inquiry is governed by standards different from those applicable to a determination of whether an individual is in custody for purposes of Miranda. See Newton, 369 F.3d at 673 ("'[W]hether an individual . . . has been unreasonably seized for Fourth Amendment purposes and whether that individual is 'in custody' for Miranda purposes are two different issues'" (quoting United States v. Kim, 292 F.3d 969, 976 (9th Cir. 2002))); see also United States v. Alcantara, No. 09 CR 231 (NRB), 2009 WL 4756491, at *8 (S.D.N.Y. Dec. 2, 2009) ("The

## C.      Whether McDow was Illegally Detained in the Building Lobby under the Fourth Amendment

The Government argues that McDow's interaction with the officers constitutes

either a "voluntary encounter" or a Terry stop. (Hearing Tr. (Dkt. No. 141) at 19-21)  The

Government further contends that the officers performed no more than a "patdown of

[McDow's] pockets," and that the officers' "patdown" was appropriate because they had a

"reasonable suspicion" that McDow was engaged in illegal activity. (Id. at 21)

McDow argues, however, that "he was arrested the moment the police officers got

out of the[ir] car" (Hearing Tr. (Dkt. No. 132) at 7), and that his arrest constitutes an illegal

seizure under the Fourth Amendment. (Paul Affirm. (Dkt. No. 77) ¶¶ 7-9)

### 1.      Whether the Encounter between McDow and the Officers was "Voluntary," and Whether the Officers had "Reasonable Suspicion" to Conduct a *Terry* Stop

#### a.      Applicable Law

A voluntary or consensual encounter is an interaction with law enforcement in

which "a reasonable person would feel free 'to disregard the police and go about his business.'"

Florida v. Bostick, 501 U.S. 429, 434 (1991) (quoting California v. Hodari D., 499 U.S. 621, 628

(1991)); see United States v. Tehrani, 49 F.3d 54, 62 (2d Cir. 1995) (whether a law enforcement

encounter is consensual depends on "[w]hether a reasonable person would have felt free to leave

under the totality of the circumstances"). A consensual encounter "will not trigger Fourth

Amendment scrutiny unless it loses its consensual nature." Tehrani, 49 F.3d at 62; see Bostick,

501 U.S. at 434 ("Our cases make it clear that a seizure does not occur simply because a police

officer approaches an individual and asks a few questions.").

---

question of whether a particular . . . stop is valid under the Fourth Amendment is analytically
distinct from the question of whether a defendant is 'in custody' for Miranda purposes.").

A Terry stop, on the other hand, is a "'brief investigatory stop[] of [a] person[] . . . that fall[s] short of traditional arrest,'" United States v. Galan, No. 14-CR-450 RRM, 2015 WL 1602151, at *4 (E.D.N.Y. Apr. 9, 2015) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)), but nonetheless "constitute[s] [a] 'seizure[]' under the Fourth Amendment." Ligon v. City of New York, 925 F. Supp. 2d 478, 490 (S.D.N.Y. 2013). In a Terry stop, "a police officer may briefly detain an individual for questioning if the officer has a reasonable suspicion, due to observing some objective manifestation that an individual is, or is about to be, involved in a crime." United States v. Price, No. 13-CR-216 RRM, 2014 WL 558674, at *5 (E.D.N.Y. Feb. 11, 2014) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Padilla, 548 F.3d 179, 186 (2d Cir. 2008)).

"As part of a Terry stop, an officer may conduct a pat-down frisk . . . which [consists of] a 'carefully limited search of the outer clothing . . . in an attempt to discover weapons.'" Tarhaqa Allen, 2010 WL 1790429, at *7 (quoting Terry, 392 U.S. at 30). "In order to conduct [this] limited, self-protective search for weapons, an officer must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." Evans v. Solomon, 681 F. Supp. 2d 233, 247 (E.D.N.Y. 2010) (citing Pennsylvania v. Mimms, 434 U.S. 106, 111-12 (1977)). Since "[t]he sole justification of the search . . . is the protection of the police officer and others nearby, . . . it must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry, 392 U.S. at 29.

Under Terry, "police may only stop someone when they have 'reasonable suspicion supported by articulable facts that criminal activity may be afoot.'" United States v. Freeman, 735 F.3d 92, 95-96 (2d Cir. 2013) (quoting United States v. Sokolow, 490 U.S. 1, 7

(1989)); see United States v. Singletary, 798 F.3d 55, 59 (2d Cir. 2015) ("To justify a Terry stop, there must be 'a reasonable basis to think that the person to be detained "is committing or has committed a criminal offense."'" (quoting United States v. Bailey, 743 F.3d 322, 332 (2d Cir. 2014))). "Reasonable suspicion must be 'based on specific and articulable facts' and not on 'inchoate suspicion or mere hunch.'" Freeman, 735 F.3d at 96 (quoting United States v. Bayless, 201 F.3d 116, 132-33 (2d Cir. 2000)); see Singletary, 798 F.3d at 59 (Reasonable suspicion "demands 'specific and articulable facts which, taken together with rational inferences from those facts,' provide detaining officers with a 'particularized and objective basis for suspecting legal wrongdoing[.]'" (quoting Terry, 392 U.S. at 21; then quoting Arvizu, 534 U.S. at 273)).

When "making reasonable-suspicion determinations, . . . [courts] must look at the 'totality of the circumstances' of each case to see whether the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." Arvizu, 534 U.S. at 273 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). "While [courts] evaluate this totality of the circumstances 'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training,' [courts] do 'not merely defer to the police officer's judgment.'" Freeman, 735 F.3d at 96 (quoting Bayless, 201 F.3d at 133). Moreover, because "a stop must be 'justified at its inception,'" "[a]ny events that occur after a stop is effectuated cannot contribute to the analysis of whether there was reasonable suspicion to warrant the stop in the first instance." Id. (quoting Terry, 392 U.S. at 20).

### b.   Analysis

For the reasons discussed above, this Court has concluded that – from the time that the officers initially approached McDow – a reasonable person in McDow's position would not have felt free to leave. McDow's interaction with the police thus cannot be characterized as

a voluntary encounter. See Tehrani, 49 F.3d at 62 (a voluntary encounter is one in which "a reasonable person would have felt free to leave under the totality of the circumstances"). Accordingly, it is necessary to consider whether the officers had "reasonable suspicion" justifying a Terry stop of McDow.

The evidence before this Court does not demonstrate that – at the time the officers approached McDow on the sidewalk – they had a "'particularized and objective basis for suspecting legal wrongdoing.'" Singletary, 798 F.3d at 59 (quoting Arvizu, 534 U.S. at 273). Officer Kinane's hearing testimony suggests, at best, that – during the forty-five minutes to an hour that he observed McDow from the rooftop – he saw McDow engage in a brief encounter with one individual, or perhaps more than one. (Hearing Tr. (Dkt. No. 132) at 55-56, 57, 73) Acknowledging that McDow was standing in a "narcotics-prone" location (id. at 3, 5, 52), Officer Kinane did not testify that he observed exchanges of items, whether currency, cash or otherwise. Officer Kinane's observation that McDow had a brief encounter with one or more individuals over the span of forty-five minutes to an hour does not provide "'a reasonable basis to think that [McDow] '[was] committing or ha[d] committed a criminal offense.'" Singletary, 798 F.3d at 59 (quoting Bailey, 743 F.3d at 332).

Moreover, as discussed above, Officer Kinane's testimony concerning his rooftop observations is not reliable. First, that testimony is so vague as to raise serious concerns as to whether he has any clear recollection of the events on Decatur Avenue on August 4, 2014. For example, Officer Kinane could not recall how many "quick meetings" he observed McDow engage in, whether McDow was standing on the street alone or with other individuals, or whether McDow went "to any location with any other individual." (Hearing Tr. (Dkt. No 132) at 57, 73, 75) Second, there are significant discrepancies between Officer Kinane's grand jury

testimony and his testimony at the suppression hearing, and the Government has offered no explanation for those inconsistencies. Indeed, at the suppression hearing, Officer Kinane acknowledged that one critical portion of his grand jury testimony – in which he testified that when he approached McDow on Decatur Avenue he saw McDow "exchanging U.S. currency for objects" (Kinane 3502-08 (State Grand Jury Tr.) at JG 4)) – is flatly wrong. (Hearing Tr. (Dkt. No. 132) at 67-68, 74-75) For all these reasons, this Court does not have confidence that Officer Kinane accurately recalls what he observed on August 4, 2014. In sum, even assuming that Officer Kinane's testimony concerning his rooftop observations could provide a basis for "reasonable suspicion," his testimony is not credible. See United States v. Williams, No. CR-06-0810 (CPS), 2007 WL 643051, at *3 (E.D.N.Y. Feb. 26, 2007) ("The credibility of witnesses on a motion to suppress is for the district court hearing the testimony to determine." (citing Unites States v. Vita, 294 F.2d 524, 528 (2d Cir. 1961))).

Officer Gembecki testified, however, that McDow was "very nervous" when the officers approached him on the sidewalk,[14] and both officers testified that Decatur Avenue at East 193rd Street is a "narcotics-prone location." (Hearing Tr. (Dkt. No. 132) at 3, 5, 13, 52) While the nervousness of a suspect and his presence in an area known for drug trafficking are both relevant factors in a "reasonable suspicion" determination, see Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000) ("[o]ur cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"; collecting cases); Holeman v. City of New London, 425 F.3d 184, 190 (2d Cir. 2005) ("'officers are not required to ignore the relevant characteristics of a location'" in evaluating reasonable suspicion (quoting Wardlow, 528 U.S. at

---

[14] McDow's alleged nervousness is not apparent from his movements and gestures as shown in the video. (See GX 2, Video Segment 1 at 0:34-3:09)

124)), neither factor, without more, is sufficient. See Holeman, 425 F.3d at 190 ("An

'individual's presence in an area of expected criminal activity, standing alone, is not enough to

support a reasonable, particularized suspicion that the person is committing a crime[.]'" (quoting

Wardlow, 528 U.S. at 124)); United States v. Buenaventura-Ariza, 615 F.2d 29, 36 (2d Cir.

1980) ("There must be other objective facts which, when viewed in conjunction with nervous

behavior . . . raise the complex of conduct to a level justifying reasonable suspicion of criminal

activity." (footnote omitted)).

Here, the Court concludes that McDow's alleged nervousness and presence in a

drug-prone location – considered together with Officer Kinane's unreliable testimony concerning

his observations – do not amount to "'articulable facts [suggesting] that criminal activity may be

afoot.'" Freeman, 735 F.3d at 95-96 (quoting Sokolow, 490 U.S. at 7). "[L]ook[ing] at the

'totality of the circumstances'" Arvizu, 534 U.S. at 273 (quoting Cortez, 449 U.S. at 417), the

officers did not have "reasonable suspicion" to detain McDow.

Because the officers lacked "reasonable suspicion," McDow was subject to an

illegal seizure when he was detained on the sidewalk and then brought into the Building lobby.

See Freeman, 735 F.3d at 95-96 ("Under . . . Terry v. Ohio, 392 U.S. 1 (1968), police may only

stop someone when they have 'reasonable suspicion. . . .'"). As a result, both McDow's

statement concerning "Bs" and "crills" and all physical evidence recovered as a result of that

statement must be suppressed under the Fourth Amendment.[15] See United States v. Crews, 445

U.S. 463, 470 (1980) (with regard to "evidence . . . obtained from a violation of the Fourth

---

[15]  The Government concedes that, if McDow's statement concerning "Bs" and "crills" is
suppressed, the narcotics recovered as a result of that statement must also be suppressed. (See
Govt. Supp. Br. (Dkt. No. 159) at 9 ("If . . . the Court concludes that McDow's statement about
possessing drugs is subject to suppression, then the appropriate remedy would be suppression of
the drugs."))

Amendment[,] . . . the exclusionary sanction applies to any 'fruits' of [the] constitutional

violation – whether such evidence be tangible, physical material . . . or statements of the accused

obtained during an illegal . . . detention" (footnotes omitted) (citing Wong Sun v. United States,

371 U.S. 471, 484 (1963); Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920);

Weeks v. United States, 232 U.S. 383 (1914))); Rakas v. Illinois, 439 U.S. 128, 137-38 (1978)

("our cases generally have held that one whose Fourth Amendment rights are violated may

successfully suppress evidence obtained in the course of an illegal . . . seizure"); Wong Sun, 371

U.S. at 485 (under the Fourth Amendment, the exclusionary rule applies to both "physical,

tangible materials" and "verbal statements"); Young v. Conway, 698 F.3d 69, 77 (2d Cir. 2012)

("The exclusionary rule applies not only to the 'direct products' of unconstitutional invasions of

defendants' Fourth Amendment rights, but also to the indirect or derivative 'fruits' of those

invasions." (quoting Crews, 445 U.S. at 470; citing Wong Sun, 371 U.S. at 484)); Pinto-Montoya

v. Mukasey, 540 F.3d 126, 130 (2d Cir. 2008) ("In criminal proceedings, evidence obtained as a

result of an illegal seizure . . . is, of course, subject to the exclusionary rule." (citing Wong Sun,

371 U.S. at 484–85)); Mosby v. Senkowski, 470 F.3d 515, 520 (2d Cir. 2006) ("Evidence

obtained from an unlawful . . . seizure is generally subject to exclusion as 'fruit of the poisonous

tree'" (quoting Wong Sun, 371 U.S. at 484-85 and citing Townes v. City of New York, 176 F.3d

138, 145 (2d Cir. 1999))); United States v. Singh, 811 F.2d 758, 767 (2d Cir. 1987) ("[e]vidence

obtained through an unconstitutional . . . seizure is generally excluded . . . in order to deter law

enforcement officials" (citing Wong Sun, 371 U.S. at 484-85)); United States v. Jackson, 652

F.2d 244, 248 (2d Cir. 1981) ("If . . . the evidence and confession were . . . derived [from a

Fourth Amendment violation], then they would . . . have to be excluded." (citing <u>Wong Sun</u>, 371
U.S. at 471)).[16]

### 2.  Even Assuming that the Officers had "Reasonable Suspicion," any *Terry* Stop Ripened into a *de facto* Arrest

Even if the officers' initial detention of McDow had been supported by

"reasonable suspicion," that detention far exceeded the limitations applicable to a <u>Terry</u> stop.

#### a.  Analysis

"[A]n encounter that begins as a permissible <u>Terry</u> stop may . . . ripen[] into an

arrest, which must be supported by probable cause. . . ." <u>United States v. Perea</u>, 986 F.2d 633,

644-45 (2d Cir. 1993).  In order for an encounter to remain "a <u>Terry</u> stop, not an arrest," the

officers' actions must be "'reasonably related in scope to the circumstances which justified the

interference in the first place.'" <u>United States v. Garcia</u>, 339 F.3d 116, 119 (2d Cir. 2003)

(quoting <u>Terry</u>, 392 U.S. at 20).  "'If an investigative stop based on reasonable suspicion

continues too long or becomes unreasonably intrusive, it will ripen into a <u>de facto</u> arrest that

must be based on probable cause.'" <u>United States v. Babwah</u>, 972 F.2d 30, 33 (2d Cir. 1992)

(quoting <u>United States v. Glover</u>, 957 F.2d 1004, 1011 (2d Cir. 1992)); <u>see</u> <u>Tehrani</u>, 49 F.3d at

---

[16] Suppression is, of course, not required where "the connection between the lawless conduct of
the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate
the taint.'" <u>United States v. Ceccolini</u>, 435 U.S. 268, 273-74 (1978) (quoting <u>Wong Sun</u>, 371
U.S. at 487)); <u>see</u> <u>Bailey</u>, 743 F.3d at 341 ("To avoid suppression" the court must find
"significant 'attenuat[ion]' between the Fourth Amendment violation and the challenged
statement").  There is no such attenuation here, given that both the statement concerning "Bs"
and "crills" and the physical evidence were obtained at the time of the illegal seizure. <u>See</u>
<u>Bailey</u>, 743 F.3d at 341; <u>United States v. Valentine</u>, 591 F. Supp. 2d 238, 247 (E.D.N.Y. 2008)
("A finding of attenuation 'ordinarily involves [a] showing that there was some significant
intervening time, space, or event,' . . . of which there was none in this case." (quoting <u>United
States v. Vasquez</u>, 638 F.2d 507, 528 (2d Cir. 1980))).

61 ("A permissible investigative stop may become an unlawful arrest if the means of detention
are 'more intrusive than necessary.'" (quoting Perea, 986 F.2d at 644)).

                   In evaluating "[w]hether a seizure is an arrest or a merely an investigatory
detention," courts must consider "the reasonableness of the level of intrusion under the totality of
the circumstances." Posr v. Doherty, 944 F.2d 91, 98 (2d Cir. 1991) (citing United States v.
Martinez, 808 F.2d 1050, 1053 (5th Cir. 1987)); see id. ("[W]hether an officer has exceeded the
least intrusive means of dealing with a suspect . . . depends on the facts surrounding their
encounter, and must be assessed in light of those facts."). Factors that courts have considered
"[i]n determining whether an investigatory stop is sufficiently intrusive to ripen into a de facto
arrest" include:

> the "amount of force used by the police, the need for such force, and the extent to
> which an individual's freedom of movement was restrained, and in particular such
> factors as the number of agents involved, whether the target of the stop was
> suspected of being armed, the duration of the stop, and the physical treatment of
> the suspect, including whether or not handcuffs were used."

United States v. Vargas, 369 F.3d 98, 101 (2d Cir. 2004) (quoting Perea, 986 F.2d at 645). "In
assessing whether a detention is too long or intrusive to be justified as an investigative stop,
courts properly 'examine whether the police diligently pursued a means of investigation that was
likely to confirm or dispel their suspicions quickly.'" Bailey, 743 F.3d at 336 (quoting United
States v. Sharpe, 470 U.S. 675, 686 (1985)).

                   When a Terry stop ripens into a de facto arrest, the arrest is illegal under the
Fourth Amendment unless it is "based on probable cause." Glover, 957 F.2d at 1011 (citing
Sharpe, 470 U.S. at 685; United States v. Hooper, 935 F.2d at 494)); Posr, 944 F.2d at 98 ("If . . .
an encounter has become too intrusive to be classified as an investigative detention, the
encounter is a full-scale arrest, and the government must establish that the arrest is supported by

probable cause." (citing United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989))).

Moreover, statements and physical evidence obtained as the result of an illegal arrest must be

suppressed. Pretzantzin v. Holder, 736 F.3d 641, 646 (2d Cir. 2013) ("'The general rule in a

criminal proceeding is that statements and other evidence obtained as a result of an unlawful . . .

arrest are suppressible. . . .'" (quoting I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1040-41

(1984))); Valentine, 539 F.3d at 96 (where discovery of evidence "stemmed from an illegal arrest

. . . the evidence seized . . . must necessarily be suppressed as fruit of the poisonous tree" (citing

United States v. Ingrao, 897 F.2d 860, 866 (7th Cir. 1990))); Delossantos, 536 F.3d at 158 ("The

main question we must resolve is whether [the defendant] was legally arrested. If he was not, the

evidence . . . must be suppressed as the fruit of an unlawful arrest." (citing Wong Sun, 371 U.S.

at 485–86)); United States v. Mattiex, No. 06 CR 468 (SAS), 2006 WL 2741645, at *3

(S.D.N.Y. Sept. 21, 2006) ("Where an arrest is illegal, i.e., not supported by probable cause,

evidence obtained as a result of that arrest may be suppressed as 'fruit of the poisonous tree.'"

(citing United States v. Bailey, 691 F.2d 1009, 1013 (11th Cir. 1983))).

### b.   Analysis

Officer Gembecki testified that – after the officers approached McDow – he asked

McDow "something along the lines of . . . if he had anything on him that he shouldn't have."

(Hearing Tr. (Dkt. No. 132) at 13, 35) The video shows that Officer Gembecki then proceeded

to conduct thorough searches of McDow's right and left front pockets, and left rear pocket. (See

GX 2, Video Segment 1 at 1:09-32, 1:34-47, 1:57-2:09)

Officer Gembecki's thorough search of McDow's pockets went significantly

beyond the "carefully limited search of the outer clothing" permitted during a Terry stop "in an

attempt to discover weapons." Terry, 392 U.S. at 30; see Sibron v. New York, 392 U.S. 40, 65

(1968) ("[t]he search for weapons approved in Terry consist[s] solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault"; limits applicable to a Terry stop were exceeded where officer "thrust his hand into [the suspect]'s pocket and took from him envelopes of heroin"); United States v. Casado, 303 F.3d 440, 447 (2d Cir. 2002) (search exceeded a Terry frisk where "[the officer] took the more intrusive step of reaching inside [the suspect]'s pocket and removing everything in it" (citing Sibron, 392 U.S. at 88)); United States v. Morillo, No. 11 CR 702 CM, 2012 WL 1563878, at *2 (S.D.N.Y. May 2, 2012) (because "the investigators emptied defendant's pockets," their "search exceed[ed] the bounds of a reasonable Terry stop").

Even if Officer Gembecki's thorough search of McDow's pockets was appropriate under Terry – and it was not – after the officer's repeated questioning and thorough search of McDow's pockets on the sidewalk yielded no evidence of drug trafficking, the officers' continued detention of McDow was no longer "'reasonably related in scope to the circumstances which justified the interference in the first place.'" Garcia, 339 F.3d at 119 (quoting Terry, 392 U.S. at 20).

In United States v. Babwah, 972 F.2d 30 (2d Cir. 1992), for example, the Second Circuit found that customs agents had "reasonable suspicion" that the defendants were involved in a money-laundering operation, and that this "reasonable suspicion" justified stopping the defendants' vehicle and obtaining consent to search their luggage. Babwah, 972 F.2d at 31, 33. The Second Circuit found, however, that the legally permissible Terry stop was "transformed into a de facto arrest" when, "despite the fact that [the] luggage contained nothing incriminating, the [a]gents continued their detention of the defendants." Id. at 33. "[I]nstead of terminating the seizure when their suspicions concerning contraband proved unfounded, the [a]gents continued

to detain the defendants," and "[t]his continued detention was nothing more than an unlawful fishing expedition." Id. at 34; see also United States v. Butler, 223 F.3d 368, 375 (6th Cir. 2000) (although the police had "reasonable suspicion" of narcotics trafficking "to justify the initial stop," "once Defendant identified herself, answered the officer's questions, and consented to the patdown which did not reveal anything suspicious, the officers were required under the Fourth Amendment to allow Defendant to go free"); United States v. Felix, No. 08-CR-68A, 2009 WL 483178, at \*2 (W.D.N.Y. Feb. 25, 2009) (although police officers had "reasonable suspicion" that the defendant "might be armed with a weapon that he was attempting to sell illegally," "[o]nce it was determined that the defendant did not have the weapon on his person, the basis for the Fourth Amendment seizure dissipated . . . and the defendant should have been released").

Here – when the officers continued to detain McDow after their questioning and thorough search of his pockets yielded no evidence of the suspected crime – the Terry stop became "unreasonably intrusive" and "ripen[ed] into a de facto arrest that must be based on probable cause.'" Babwah, 972 F.2d at 33 (quoting Glover, 957 F.2d at 1011). The officers lacked probable cause to arrest McDow, however, because – as discussed above – Officer Kinane's rooftop observations did not provide probable cause, and nothing emerged on the sidewalk that provided probable cause. Accordingly, when the officers continued their detention of McDow by directing him to enter the lobby of 2559 Decatur Avenue – so that they could perform a more thorough search – McDow was subjected to an illegal seizure under the Fourth Amendment.

In sum, even if the Court were to find that the officers had "reasonable suspicion" to justify a Terry stop when they first approached McDow, the encounter ripened into an illegal arrest before either (1) McDow made his statement about possessing "Bs" and "crills"; or (2) any

36

physical evidence was obtained. Because the arrest of McDow was not supported by probable

cause, his statement concerning "Bs" and "crills," and all physical evidence recovered as a result

of that statement, must be suppressed under the Fourth Amendment. See Dunaway v. New

York, 442 U.S. 200, 205, 207, 212-13 (1979) (where the "petitioner's seizure" went beyond "the

narrowly defined intrusions involved in Terry and its progeny" and "amount[ed] to an arrest"

without probable cause, the statement and physical evidence obtained as the result of the arrest

must be suppressed); Babwah, 972 F.2d at 33-34 (where "the detention of the defendants had lost

its identity as a lawful investigatory stop" and had become an unlawful arrest, "the evidence

seized . . . should have been suppressed"); United States v. Ceballos, 654 F.2d 177, 186 (2d Cir.

1981) (reversing district court's denial of motion to suppress statement and physical evidence

where Terry stop had ripened into an arrest without probable cause); Felix, 2009 WL 483178, at

*4 (where Terry stop had ripened into an illegal arrest, "any statements made by the defendant

while he was illegally detained must be suppressed," and "the gun which was discovered by

exploitation of the tainted statements . . . must be suppressed"); United States v. O'Boyle, No. 86

CR 735 (JCF), 1986 WL 15358, at *2-4 (S.D.N.Y. Dec. 12, 1986) (where the detention of the

defendant exceeded the bounds of "an investigatory stop" and became "tantamount to [an]

arrest" "without probable cause," the "evidence obtained pursuant to the arrest[] shall be

suppressed").

     Accordingly, McDow's motion to suppress will be granted, both as to statements

he made to Officers Gembecki and Kinane, and as to the physical evidence recovered from his

person.

## II.    MOTION FOR RULE 404(b) MATERIAL

McDow requests disclosure of evidence that the Government will seek to introduce under Federal Rule of Evidence 404(b) at least 45 days prior to trial, as well as a hearing to determine the admissibility of such evidence. (Notice of Motion (Dkt. No. 76) ¶ 3; Paul Affirm. (Dkt. No. 77) ¶¶ 16-18) "Rule 404(b) only requires 'reasonable notice in advance of trial' for the admission of prior convictions and bad acts," however.   United States v. Russo, 483 F. Supp. 2d 301, 309 (S.D.N.Y. 2007). "The rule establishes no minimum time . . . because 'the evidence the government wishes to offer may well change as the proof and possible defenses crystallize.'"   Id. (quoting United States v. Matos–Peralta, 691 F. Supp. 780, 791 (S.D.N.Y. 1988)). Here, the Government has represented that "it will provide 404(b) notice in advance of trial . . . as is standard practice in this [D]istrict." (Govt. Br. (Dkt. No. 82) at 9)  Accordingly, there is no need to issue the order requested by McDow, and McDow's motion is therefore denied. See Russo, 483 F. Supp. 2d at 309 ("The government has in good faith noted its obligations under Rule 404(b), and indicated that it intends to provide notice of the 404(b) evidence . . . before the beginning of trial. . . . There is therefore no need to issue the order Defendants seek."); United States v. Ramirez, No. Cr. 91–493, 1991 WL 177239, *2 (S.D.N.Y. August 30, 1991) ("The government has represented that it will provide timely notice of any intent to introduce [404(b)] evidence so that there is no need to issue the order defendant seeks.").

## III.    MOTION FOR EXCULPATORY AND IMPEACHMENT EVIDENCE

McDow seeks production of exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963), as well as evidence that would be useful to impeach the credibility of Government witnesses under Giglio v. United States, 405 U.S. 150 (1972), United States v.

Bagley, 473 U.S. 667 (1985), and Kyles v. Whiteley, 514 U.S. 419 (1995).  (Notice of Motion

(Dkt. No. 76) ¶ 4; Paul Affirm. (Dkt. No. 77) ¶¶ 19-24)  The Government has indicated that it

"has complied with its obligations pursuant to Brady and is not aware of any additional Brady

materials in this case." (Govt. Br. (Dkt. No. 82) at 10)  With regard to evidence that would be

useful to impeach the credibility of government witnesses, the Government has indicated that it

will produce such material "two weeks before any trial." (Id. at 11)

        Under the Due Process Clause, the Government has a continuing obligation to

provide Brady material to the accused.  Brady, 373 U.S. at 87.  The Government has

acknowledged its obligation and has indicated it "will continue to provide timely disclosure of

Brady material if and when any such material comes to light." (Govt. Br. (Dkt. No. 82) at 10)

No more is required.  See United States v. Gallo, No. 98 CR. 338(JGK), 1999 WL 9848, at *8

(S.D.N.Y. Jan. 11, 1999) (denying motion to compel production of Brady material where "the

Government represents that it is aware of its obligations under Brady . . . and will produce any

Brady material to the defense well before trial.").

        As for impeachment material, the Second Circuit has stated that the Government

is only required to produce such material "in time for its effective use at trial." United States v.

Coppa, 267 F.3d 132, 146 (2d Cir. 2001).  The Government has represented that it will produce

Giglio and Jencks Act material "two weeks before any trial." See Govt. Br. (Dkt. No. 82) at 11;

see also 18 U.S.C. § 3500 et seq.  McDow has not explained why this disclosure schedule will

not allow defense counsel adequate time to prepare for cross-examination of Government

witnesses.  Accordingly, McDow's motion for production of exculpatory evidence under Brady

v. Maryland, 373 U.S. 83 (1963), as well as evidence that would be useful to impeach the

credibility of Government witnesses, will be denied.

## IV.   <u>OTHER MOTIONS</u>

McDow requests an order permitting him to make further motions as may be appropriate, and an order permitting him to join in any motions made by co-defendants. (Notice of Motion (Dkt. No. 76) ¶¶ 5-6; Paul Affirm. (Dkt. No. 77) ¶ 25)

With respect to further pretrial motions, Federal Rule of Criminal Procedure 12(c) states that "[t]he court may . . . set a deadline for the parties to make pretrial motions. . . . If the court does not set one, the deadline is the start of trial. . . . If a party does not meet the deadline for making a [pretrial] motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause." Fed. R. Crim. P. 12(c).

Here, at an October 22, 2015 conference, the Court set a December 7, 2015 deadline for any motion to suppress – the only pretrial motion that McDow indicated that he planned to file. (See Oct. 21, 2015 Tr. (Dkt. No. 72) at 6-7; Dkt. No. 65) By order dated April 29, 2016 (Dkt. No. 140), the Court set a schedule for motions in <u>limine</u>, proposed voir dire, requests to charge, and any other pretrial filings. Those dates remain in effect.

With respect to McDow's request for permission to join in motions made by co-defendants, none of McDow's co-defendants filed pretrial motions, and all of McDow's co-defendants have pleaded guilty. Accordingly, this request will be denied as moot.

40

## CONCLUSION

For the reasons stated above, McDow's motion to suppress is granted, and his remaining motions are denied.  The Clerk of the Court will terminate the motions (Dkt. Nos. 76, 77).

Dated: New York, New York
       June 28, 2016

SO ORDERED.

_Paul G. Gardephe_

Paul G. Gardephe
United States District Judge